**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| Plaintiff : | |
| : | |
| v. : | 11 CV 6500 (RA) |
| : | |
| **ONE OR MORE UNKNOWN PURCHASERS OF** : | |
| **SECURITIES OF GLOBAL INDUSTRIES, LTD.**, : | |
| : | |
| Defendants. : | |
| : | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO INTERVENE**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    PROCEDURAL BACKGROUND.................................................................... 1

III.   ARGUMENT .................................................................................................. 10

    A.   The Kyrgyz Republic Meets the Criteria for Intervention as of Right. ................... 10

        1.   The Motion is Timely. ................................................................... 11

        2.   The Kyrgyz Republic has a Direct Interest in the Litigation. ......................... 13

        3.   Disposition of this Case Without The Kyrgyz Republic's Intervention Will Impair its Ability to Protect its Interests. ....................................... 14

        4.   The Kyrgyz Republic's Interest are Not Adequately Protected by the Other Parties.......................................................................... 14

IV.    CONCLUSION............................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Crabtree v. Colorado*,
  No. 88-C-1012, 1989 WL 91119 (D. Colo. Aug. 9, 1989).....................................................13

*Forest Serv. Emps. For Envtl. Ethics v. U.S. Forest Serv.*,
  Civil Action No. 08-323 Erie, 2009 WL 1324154 (W.D. Pa. May 12, 2009 ..........................13

*In re Oceana Int'l, Inc.*,
  49 F.R.D. 329 (S.D.N.Y. 1969) ..............................................................................................13

*Int'l Design Concepts, L.L.C. v. Saks, Inc.*
  486 F.Supp. 2d 229 (S.D.N.Y. 2007).......................................................................................11

*Kruse v. Wells Fargo Home Mortg., Inc.*,
  No. 02-CV-3089 (ILG), 2006 WL 1212512 (E.D.N.Y. May 3, 2006)....................................11

*Mastercard Int'l., Inc. v. Visa Int'l Serv. Assoc., Inc.*,
  471 F.3d 377 (2nd Cir. 2006)...................................................................................................10

*McNeill v. New York City Hous. Auth.*,
  719 F. Supp. 233 (S.D.N.Y. 1989)...........................................................................................10

*Mortg. Lenders Network, Inc. v. Rosenblum*,
  218 F.R.D. 381 (E.D.N.Y. 2003) .............................................................................................11

*Raylite Elec. Corp. v. Noma Elec. Corp.*,
  170 F.2d 914 (2d Cir. 1948).....................................................................................................13

*U.S. v. Munir*,
  12-cr-00648 (E.D.N.Y. April 2, 2012)...................................................................................4, 6

*United States Postal Service v. Brennan*,
  579 F.2d 188 (2d Cir.1978).......................................................................................................10

*United States v. Lauer*,
  242 F.R.D. 184 (D.Conn. 2007)...............................................................................................11

*United States v. Pitney Bowes, Inc.*,
  25 F.3d 66 (2d Cir. 1994) .........................................................................................................11

*Wheeler v. American Home Prods. Corp. (Boyle–Midway Div.)*,
  582 F.2d 891 (5th Cir. 1977) ...............................................................................................12, 13

**STATUTES AND REGULATIONS**

15 U.S.C. §78 ................................................................................................................. 1, 2

17 C.F.R. Section 240.10b ................................................................................................ 1

**RULES**

Fed.R.Civ.P. 24 ........................................................................................................ 10, 15

Fed.R.Civ.P. 41 ................................................................................................. 10, 12, 14

**OTHER AUTHORITIES**

PHILIP SHISHKIN, RESTLESS VALLEY: REVOLUTION, MURDER, AND INTRIGUE IN THE
    HEART OF CENTRAL ASIA (2013) ............................................................................ 6

COMES NOW the Kyrgyz Republic, by and through its undersigned counsel, and

submits this Memorandum of Points and Authorities in support of its Motion to Intervene herein.

## I.   PRELIMINARY STATEMENT

This case is brought by the Securities and Exchange Commission (SEC) against unknown

persons alleged to have engaged in insider trading in violation of Section 10(b) of the Exchange

Act, seeking the seizure of illicit profits, and the payment of pre-judgment interest and statutory

fines from funds identified as assets involved in the trades identified in the complaint, which

include funds restrained by freezing orders issued in the case. Subsequent proceedings in this

action have brought forth information indicating that the unknown persons who directed and

conducted the include a former Kyrgyz government official and a close associate charged and

convicted in absensia in the Kyrgyz Republic with large scale corruption and the theft of public

funds, and that the funds utilized in the trades, including the restrained funds, constitute, include,

or are proceeds of the stolen Kyrgyz public funds.  The Kyrgyz Republic seeks leave to intervene

in this case to pursue its claim for the imposition of a constructive trust over these funds and

assets, including the restrained funds, and the return of such funds and assets to the Kyrgyz

Republic.  As discussed in detail below, the Kyrgyz Republic satisfies each of the criteria for

intervention as of right in this action.

## II.   PROCEDURAL BACKGROUND

This case is brought by the SEC against One or More Unknown Purchasers for engaging

in insider trading in violation of Section 10(b) of the Exchange Act (15 U.S.C. Section 78j(b)),

and Rule 10b-5 thereunder (17 C.F.R. Section 240.10b).

The action, filed on September 16, 2011, alleges that the defendants, in reliance on

material non-public information in their possession, engaged in the purchase of common shares

of Global Industries, Ltd. ("Global") in advance of an announcement that it was to be acquired

by a non-U.S. company.  When the acquisition was announced, on September 12, 2011,

defendants obtained approximately $5,300,000 in proceeds, including approximately $1,726,810

in illicit gains through sale of shares at the higher, post-announcement price, which funds were

held in the United States in accounts maintained in the name of Austrian bank Raiffeisen Bank

International, AG ("RBI").  Relief sought in the Complaint includes disgorgement of illicit

trading profits, payment of pre-judgment interest, and the imposition of civil money penalties

pursuant to Exchange Act §21A (15 U.S.C. §78u-1).  *See* Complaint [Dkt. No. 1].

On September 16, 2011, Judge Castel, to whom this case was previously assigned,

entered a temporary restraining order freezing assets tied to the alleged fraud and ordering the

unknown Defendants to show cause why a preliminary injunction should not issue [Dkt. No. 4].

Defendants failed to appear and, on September 22, 2011, Judge Castel granted a preliminary

injunction extending the asset freeze.  [Dkt. No. 7]  That order also required, *inter alia,* that

Defendants disclose contact information and any accounts held in their names.

Pursuant to the court's freezing orders, information was provided to the SEC confirming

that the Global trades had been executed by the Latvian bank JSC Baltic International Bank

("BIB") via RBI acting as a broker on behalf of BIB's client, and that the proceeds of the trades

in the amount of $5,338,763.63 were held in an RBI trading account with Brown Brothers

Harriman & Co. held at Citibank, New York.  BIB advised the SEC that it had served the

complaint and freezing orders on its client, the identity of whom was not provided.

On April 13, 2012, Ergoport Experts Limited "(Ergoport") appeared in this case,

providing addresses in New Zealand and Russia and a bank account number at BIB.  [Dkt. No.

13].  Three days later, Ergoport identified itself as the purported legal owner of the seized assets.

*See* Ergoport's Responses to II.(A) and II.(B) of Preliminary Injunction Freezing Assets and Granting Other Relief [Dkt. No. 12].  On May 10, 2012, Judge Castel endorsed a stipulation between the SEC and Ergoport that modified the asset freeze in the Court's Preliminary Injunction to limit it to funds held in the Citibank account in the amount of $5,338,763.63.

The matter was reassigned to The Honorable Ronnie Abrams on July 9, 2012.

On July 31, 2012, Ergoport filed an answer [Dkt. No. 17] to the Complaint admitting to making the relevant trades but denying wrongdoing, and claiming that any harm incurred was the result of acts or omissions of third parties over whom Ergoport had no control, which acts it claims constitute intervening or superseding causes of any alleged violations of the securities laws.

Ergoport filed a Rule 7.1 Corporate Disclosure Statement [Dkt No. 16] on July 31, 2012 representing that it was a wholly-owned subsidiary of "Interhold Limited."

Prior to the entry of a case management plan or scheduling order, or the start of discovery in this case, on August 16, 2012 the U.S. Attorney filed an Application to Intervene and to Stay Discovery [Dkt No. 22] in this matter in order to protect the government's interests in an on-going criminal investigation of an insider trading scheme that involved the Global transactions identified in the SEC's Complaint.  Both the SEC and the U.S. Attorney's Office have indicated that they were each unaware of the overlap in their respective investigations until after the SEC Complaint was filed in September, 2011.

According to the information provided by the United States Attorney in support of its Motion, the Global stock trades were part of a larger insider trading scheme that appears to have been directed and conducted by Maksim Bakiyev, son of former Kyrgyz President Kurmanbek Bakiyev, with funds constituting or involving stolen public monies or proceeds of stolen public

monies belonging to the Kyrgyz Republic, and/or proceeds of crimes committed in the Kyrgyz Republic.  The investigation as represented by the U.S. Attorney involved a conspiracy to engage in insider trading of stocks on U.S. and foreign markets between individuals acting as financial advisors and traders under the direction of an individual identified as a former high-level government official of a Central Asian Country now living in England following the overthrow of his regime in April 2010.

The U.S. Attorney asserts that Ergoport is a "shell company" created with the "primary purpose . . . to conceal the illegal activities of the beneficiaries of the Ergoport bank accounts," thereby creating the serious "risk that the targets of the investigation will use civil discovery to further their attempts to conceal their activities by attempting to manufacture or destroy evidence or to intimidate witnesses."  U.S. Attorney Reply to Defendant Ergoport's Opposition to Motion to Intervene, Sept. 21, 2012 [Dkt. No. 26] ("Reply") at 3-5; *see also* Oct. 12, 2012 Hearing Tr. [Dkt. No. 29] at 3:23-4:5 ("[I]t appears from our investigation that Ergoport itself was created essentially in order to conceal the conspiracy that we are investigating. So given that an effort has already been made to conceal evidence, it is our concern that if additional discovery is provided and names of witnesses are provided, that the risk that further attempts to mask criminal activities will take place.").

While the government has not provided the names of the individuals involved in the ongoing criminal investigation, information provided in support of its Motion identifies by description individuals accused by the Kyrgyz Republic of operating a criminal organization within its territory and jurisdiction from 2005 until April, 2010.  The Complaint and Affidavit in Support of Arrest Warrant filed in April 2012 (and unsealed on July 23, 2012) against Tayyib Ali Munir ("Munir"), a trader at Brown Brothers Harriman & Co. who was involved in the Global

trades (*U.S. v. Munir*, 12-cr-00648, (E.D.N.Y. April 2, 2012) [Dkt. 1], submitted by the

government as an exhibit to its Reply [Dkt. No. 26-1]) presents details of the investigation

obtained primarily through a cooperating witness identified as the confidential source, or "CS",

the description and identification of whom matches Eugene Gourevitch, a close associate of

Maksim Bakiyev:

- Identified as a U.S. citizen who from January 2008 until April 2010 was CEO of a "financial advisory and consulting firm based in New York, New York and in a country located in Central Asia." Munir Compl. ¶3.

- Who during that time lived primarily in the Central Asia Country, and maintained a personal and professional relationship with a high-level government official of the Central Asian Country who fled to England after his government was overthrown in a coup in April, 2010, identified as co-conspirator #1 or "CC-1." *Id*.

- After April, 2010, was charged by the new government of the Central Asian Country together with CC-1 with theft of state assets, laundering stolen funds and other crimes arising out of corruption in the deposed regime. *Id*. ¶4.

- Faces money laundering charges in Italy brought in February 2010 arising from a large and complex tax fraud scheme. *Id*.

- Was charged with an extortion conspiracy conducted in the Central Asian Country in a complaint filed in this court, resulting in the issuance of an arrest warrant signed by US Magistrate Judge Robert M. Levy on June 2, 2011. *Id*. ¶5.

- Returned to the United States in December, 2011, under an agreement to cooperate with the US government, in which he admitted his activities in

connection with insider trading and other criminal activities.  *Id*. ¶6.

Gourevitch is a U.S. citizen, and was the CEO of the MGN Group, a financial advisory and consultancy firm headquartered both in New York and the Kyrgyz Republic.  From 2008 until April 2010 Gourevitch lived primarily in the Kyrgyz Republic, and maintained a personal and professional relationship with Maksim Bakiyev, the son of then-President of the Kyrgyz Republic and head of the state Agency for Development, Investment and Innovation (known as "CADII") until the regime was overthrown in a popular uprising in April 2010.  Maksim Bakiyev is believed to currently be in England, where he is seeking asylum.  Both Gourevitch and Maksim Bakiyev have been charged by the new government of the Kyrgyz Republic with the theft of public assets and the laundering of stolen public assets and other crimes arising from corruption in the deposed regime.  Gourevitch additionally was charged in Italy in February 2010 with money laundering and other crimes.  Gourevitch was reportedly living in New York in February 2012, having returned in connection with charges filed against him in this Court.  *See* PHILIP SHISHKIN, RESTLESS VALLEY: REVOLUTION, MURDER, AND INTRIGUE IN THE HEART OF CENTRAL ASIA 206-208 (2013).

Information contained in the *Munir* complaint further suggest that the insider trading scheme was conducted by  Maksim Bakiyev with monies obtained from criminal activities in which he was involved in the Kyrgyz Republic, including the theft of public funds:

- ■   Since approximately April 2010 the CS has managed CC-1's investments.  *Munir* Compl. ¶7.

- ■   Activities include online securities trading involved in investing funds held by CC-1 in two separate accounts at BIB. *Id*.

- ■   The accounts are controlled by CC-1, but held in the name of a shell company

registered in New Zealand and created to conceal CC-1's banking activities. *Id*.

■    One of the accounts at BIB, holding approximately $45 million, is used in connection with insider trading activities based on information that the CS has obtained from Munir. *Id*.

■    During 2010 and 2011 the CS invested CC-1's funds in the account with CC-1's knowledge and express authorization in securities listed variously on stock exchanges in New York, London, Milan and Madrid based on insider information provided by Munir. *Id*. ¶8.

■    CC-1 has at least one other bank account located at a Russian bank from which CC-1 and the CS have engaged in insider trading. *Id*. at 5 n.1.

■    For each trade that he agreed to pursue, CC-1 would contact BIB and notify the bank that the CS was authorized to use the Account to purchase securities in the agreed amount. The CS would then direct BIB to execute the trades, and to subsequently to sell the shares. *Id*. ¶10.

■    Since he began his cooperation with the government (in December, 2011), the CS has engaged in a series of consensually recorded conversations with CC-1 and Munir about past and future insider trading deals, including conversations with Munir recorded on January 3, January 12, and January 14, 2012. *Id*. ¶¶12-15.

■    These conversations provided evidence and admissions of the involvement of the CS, Munir and CC-1 in the use of insider information in trades of shares of Aviva (London- listed stock), in Tyco International, Ltd. in April, 2011, InterMune, Inc. in April and July, 2011, and in Global in September, 2011. *Id*. ¶¶13-15.

■    The information provided by the CS was corroborated by "bank records,

consensual recordings, information provided by other witnesses, and public records." *Id*. ¶6.

CC-1 and CS's identities as Maksim Bakiyev and Eugene Gourevitch have been confirmed and widely reported by news outlets. *See, e.g.* Christie Smythe, *Kyrgyzstan in Talks With U.S. Over Ex-Leader's Son*, BLOOMBERG, Dec. 4, 2012, www.bloomberg.com/news/2012-12-04/kyrgyzstan-in-talks-with-u-s-over-ex-leader-s-son.html; Alan Cullison & Devlin Barrett, *Asian Scion's Trades Draw Scrutiny*, WALL STREET JOURNAL, Oct. 17, 2012, online.wsj.com/news/articles/SB10000872396390444592704578062501410114458.html.

Among the transfers of funds from Asia Universal Bank and Manas Bank between 2007 and April 2010, which the Kyrgyz Republic claims to have been illegal, were a number of transfers to accounts at BIB.  Criminal charges filed by Kyrgyz authorities against Maksim Bakiyev, Gourevitch and others, assert that some of these transfers were executed through Gourevitch and the MGN Group, and transferred public funds of the Kyrgyz Republic placed under Gourevitch's control by Maksim Bakiyev. On information and belief Ergoport and Interhold are both shell companies established in New Zealand and part of the company group, or platform, used by Maksim Bakiyev and his associates for the purpose of concealing their activities.  There exists no indication that either Ergoport or Interhold engage in any business or commerce, have operating management or employees, or engage in any functions other than the holding and transferring of funds.

The structuring of the subject trades, where Brown Brothers Harriman & Co. interfaced with RBI, acting as a broker for BIB, who in turn was acting on behalf of a client, and particularly the use of Ergoport as the "client" (making purchases through an omnibus account, the records of which do not identify the beneficial owners (Compl. [Dkt. No. 1] ¶ 6)) evidences

an intention to conceal the real party in interest in the suspect trades, and the awareness of the defendants of the criminal nature of the enterprise and/or illicit source of the funds.

The court permitted the government's intervention in this case on November 9, 2012, and imposed a stay of proceedings for a period of six months, or until May 9, 2013, with the possibility of an extension for good cause shown.

On October 15, 2012, Munir pled guilty to a single count of conspiracy to engage in insider trading, in violation of 18 U.S.C. § 371.  12 Cr. No. 648 (E.D.N.Y. Oct. 15, 2012) [Dkt. No. 18].  As part of the sentencing Munir admitted to offering to sell confidential earnings reports about unspecified companies to a government informant in January 2012, which he ultimately didn't provide.  Following a hearing on January 7, 2013, U.S. District Judge Jack Weinstein sentenced Munir to time served, and 3 years supervised release.   12 Cr. No. 648 (E.D.N.Y. Jan. 9, 2013) [Dkt. No. 28].

On or about October 12, 2012, Maksim Bakiyev was detained by UK authorities in London in connection with a request by the United States for his extradition to face trial in U.S. federal court on serious charges of conspiracy to commit securities fraud and obstruction of justice.  A hearing initially scheduled in London for December 2012, was reportedly rescheduled for on or around May 13, 2013.

On October 17, 2012, it was widely reported in the media that Gourevitch had been arrested on his arrival in Rome to face the pending money laundering charges.

On May 9, 2013, the U.S. Attorney of the Eastern District confirmed, without explanation, that the criminal securities fraud case against Maksim Bakiyev had been dismissed. *See* Christie Smythe & Jeremy Hodges, *U.S. Case Ends Against Ex-Kyrgyz Leader Bakiyev's Son*, BLOOMBERG, May 9, 2013,

www.bloomberg.com/news/2013-05-09/u-s-case-ends-against-ex-kyrgyz-leader-bakiyev-s-son.html.

On May 31, 2013, the SEC and Ergoport submitted a joint status report representing that the SEC was seeking permission from the Commission to voluntarily dismiss the complaint through the filing of a Joint Stipulation of Dismissal pursuant to Fed.R.Civ.P. 41(a)(1)(A)(ii) [Dkt. No. 33]. No explanation or reason for the SEC's desire to dismiss this action have been provided. On October 15, 2013, the SEC and Ergoport filed a stipulation of voluntary dismissal [Dkt. No. 37]. That stipulation did not include the signature of the U.S. Attorney's Office.

## III.   ARGUMENT

### A.   The Kyrgyz Republic Meets the Criteria for Intervention as of Right.

A party may intervene as of right pursuant to Fed.R. Civ.P 24(a)(2) if "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." *Mastercard Int'l., Inc. v. Visa Int'l Serv. Assoc., Inc.*, 471 F.3d 377, 389 (2nd Cir. 2006).

Intervention pursuant to Fed.R.Civ.P. 24(b) is a matter of discretion for the district court. *See United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2d Cir.1978). Courts have generally adopted a liberal construction of the intervention rule, despite the fact that whether to allow intervention depends heavily upon the specific facts of the case. *See McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233, 250 (S.D.N.Y. 1989) ("[Intervention] is satisfied where a single common question of law or fact is involved, despite factual differences between the parties."); *Kruse v. Wells Fargo Home Mortg., Inc*., No. 02-CV-3089 (ILG), 2006 WL 1212512, at *4 (E.D.N.Y. May 3, 2006) ("These connections between common questions of law or fact are

10

to be construed liberally."). The Kyrgyz Republic meets all of the criteria for intervention as of right.

### 1.    The Motion is Timely.

The concept of "[t]imeliness defies precise definition, although it certainly is not confined strictly to chronology.  Among the circumstances generally considered are: (1) how long the [proposed intervenor] had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the [proposed intervenor] if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness."  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).

While the complaint was filed in this action in September 2011, it has not progressed beyond its beginning stages due to the stay entered to accommodate the U.S. Attorney's criminal investigation, which was only concluded in May 2013.  As a result of the stay of the proceedings, no Case Management Plan or Scheduling Order has been issued in the case, discovery has not yet commenced, and no material motions have been filed.  The case therefore remains at a stage where adding parties and claims is appropriate and customary.  The Court's standard Case Management Plan itself provides for a period of time after the Plan and Scheduling Order are entered in a case during which parties and claims may be added, in recognition of the lack of prejudice such joinder presents in cases at more advanced stages than this one.

A motion to intervene will be considered timely where the delay causes no prejudice to the parties.  *See Int'l Design Concepts, L.L.C. v. Saks, Inc*. 486 F.Supp. 2d 229, 234 (S.D.N.Y. 2007);  *Mortg. Lenders Network, Inc. v. Rosenblum*, 218 F.R.D. 381, 384 (E.D.N.Y. 2003) (intervention timely despite start of discovery); *United States v. Lauer*, 242 F.R.D. 184, 186 (D. Conn. 2007) (motion filed prior to filing of any substantive motions timely).  Given the early stage in the action, no prejudice will come from delay, and indeed efficiencies would be gained

11

by disposing of the Kyrgyz Republic's complaint (attached as Exhibit A to the Declaration of

Thomas McCarthy, Jr. In Support of Motion to Intervene, filed concurrently) within the context

of this action, where the parties have already appeared and the freezing orders were issued.

On the other hand, if the Kyrgyz Republic is not allowed to intervene, it will be severely

prejudiced no matter how the case is resolved.  An award in favor of the SEC would include

determination of an award of disgorgement and fines, satisfied from funds claimed by the

Kyrgyz Republic, which it will have no ability to protect.  An award in favor of Ergoport, or a

voluntary dismissal of the case, will result in the release of the restrained funds, which the

defendants will almost certainly dissipate, conceal or transfer from the jurisdiction of this court.

While not fully developed, the factual record developed thus far establishes that Ergoport has at

its disposal a network of related entities in multiple countries staffed by nominee directors and

access to bank accounts in still more jurisdictions that would facilitate such transfer or

concealment.

Although the SEC and Ergoport recently filed a stipulation of dismissal on October 15th,

that stipulation was ineffective due to the lack of authorization by all parties, as required by Rule

41(a)(1)(A)(ii).  The United States, as represented by the U.S. Attorney's Office, was granted

intervention and appeared [Dkt. No. 31].  Therefore, the U.S. Attorney's Office was required to

sign any stipulation of voluntary dismissal pursuant to Rule 41(a)(1)(A)(ii), the plain language of

which requires that the stipulation be "signed by all parties who have appeared."  Courts have in

similar circumstances overturned dismissals granted without the consent of intervenors.  *See*

*Wheeler v. American Home Prods. Corp. (Boyle–Midway Div.)*, 582 F.2d 891, 896 (5th Cir.

1977) ("The District Court dismissed this action, including the claims of the [plaintiff]

intervenors, on the basis of a stipulation between the original parties. This could not properly be

done."). District courts have similarly held that intervenor signatures are required for voluntary

dismissals. *See Forest Serv. Emps. For Envtl. Ethics v. U.S. Forest Serv.,* Civil Action No. 08-

323 Erie, 2009 WL 1324154 at *2 (W.D. Pa. May 12, 2009) (dismissal pursuant to Rule 41 not

effectuated without intervenor signatures); *Crabtree v. Colorado*, No. 88-C-1012, 1989 WL

91119 at *4 (D. Colo. Aug. 9, 1989) ("Rule 41(a) does not authorize dismissal based on a

stipulation not signed by all parties.") (citing *Wheeler*).

This is because "once intervention has been allowed, the original parties may not

stipulate away the rights of the intervener." *Wheeler*, 582 F.2d at 896 (quoting 3B Moore's

Federal Practice (2d ed.) 24–671, 672)). The Second Circuit has similarly held that "[t]he right

to intervene under Federal Rules of Civil Procedure rule 24(b) (2), 28 U.S.C.A. presupposes that

the intervener has a right to protect which is not subject to the disposition of the parties already

in the case." *Raylite Elec. Corp. v. Noma Elec. Corp.*, 170 F.2d 914, 915 (2d Cir. 1948)

(*overruled in part on other grounds by Chappell & Co. v. Frankel*, 367 F.2d 197, 200 (2d Cir.

1966)); *see also In re Oceana Int'l, Inc.*, 49 F.R.D. 329, 333-34 (S.D.N.Y. 1969) ("Once

intervention as of right has been granted, an intervenor should be entitled to litigate fully on the

merits, and be considered a party for all purposes.") (citing *Park & Tilford, Inc. v. Schulte*, 160

F.2d 984 (2d Cir. 1947*); In re Raabe, Glissman & Co.*, 71 F.Supp. 678, 680 (S.D.N.Y. 1947)).

The stipulated dismissal [Dkt. No. 37] is therefore of no consequence to this motion.

### 2.    The Kyrgyz Republic has a Direct Interest in the Litigation.

The Kyrgyz Republic meets the second part of the test for intervention. It has a direct

interest in the funds involved in the suspicious trades and subject to the court's freezing orders,

as well as an interest in the claims of both the SEC and Ergoport, which directly impact the

claims of The Kyrgyz Republic to the restrained funds. The Kyrgyz Republic expects discovery

to demonstrate that it is the rightful beneficial owner of some or all of the funds in question.

**3.    Disposition of this Case Without The Kyrgyz Republic's Intervention Will Impair its Ability to Protect its Interests.**

As outlined above, unless it is allowed to intervene in this case, the Kyrgyz Republic will have no ability to protect its interests in the restrained funds in the face of the SEC's claims for disgorgement and imposition of the statutory fine, or the claims of Ergoport for return of the funds.  Similarly, unless the Kyrgyz Republic is allowed to join this case, it is powerless to prevent the U.S. Attorney's Office, SEC and Ergoport from requesting the release of the restrained funds to Ergoport after the filing of a joint stipulation of dismissal pursuant to Fed.R.Civ.P. 41(a)(1)(A)(ii).  Any such release will result in the certain disappearance of the restrained funds, and any opportunity for the Kyrgyz Republic to pursue its claims therein.  The Kyrgyz Republic's intervention in the case will provide it with standing to protect its interests in the restrained funds.

**4.    The Kyrgyz Republic's Interest are Not Adequately Protected by the Other Parties.**

The interests of the Kyrgyz Republic in this case are not adequately protected by either the SEC or Ergoport.  The SECs claims an award of disgorgement and statutory fines from the restrained funds, which conflicts with the interests of the Kyrgyz Republic in having the funds returned.  The interests of the Kyrgyz Republic cannot be adequately protected by Ergoport, whose interests in the funds are directly and fundamentally antagonistic.  The inability of the parties to adequately protect the interests of the Kyrgyz Republic in the case is certainly evidenced in the agreement reached by the SEC and Ergoport to file a joint stipulation of dismissal, which, had it been effective, would have resulted in the likely loss of the ability of the Kyrgyz Republic to pursue its claims.

IV.     **CONCLUSION**

The request of the Kyrgyz Republic to intervene in this action satisfies each of the factors identified in Fed.R.Civ.P. 24.  The intervention of the Kyrgyz Republic will assist the court by providing a more complete record, contributing to the full development of the underlying factual issues, assisting with the just and equitable adjudication of the legal questions facing the court, and will support and further the mandate of the SEC in the enforcement of the security laws of the United States.  For the foregoing reasons, the Kyrgyz Republic respectfully requests that the motion to intervene be granted in all respects.  In the alternative, should the Court deny the instant motion to intervene, the Kyrgyz Republic respectfully requests that the Court refrain from ordering the release of the frozen assets until such time as the Kyrgyz Republic has filed a stand-alone complaint seeking similar relief and a disposition has been reached on a motion for a temporary restraining order freezing the assets in question.

**DATED**:  November 5, 2013

New York, New York

AKIN GUMP STRAUSS HAUER & FELD LLP

Paul W. Butler
Thomas McCarthy, Jr.
1333 New Hampshire Ave., NW
Washington, DC 20036
Tel: (202) 887-4000
Fax: (202) 887-4288
pbutler@akingump.com
mccarthyt@akingump.com

Nicholas C. Adams
One Bryant Park
New York, NY  10036-6745
Tel: (212) 872-1000
Fax: (212) 872-1002
nadams@akingump.com
*Attorneys for Intervenor the Kyrgyz Republic*

15